**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| **INSIGHT TERMINAL SOLUTIONS** | **PLAINTIFF** |
| **v.** | **No. 3:25-cv-23-BJB** |
| **CITY OF OAKLAND** | **DEFENDANT** |

* * * * *

**OPINION & ORDER OF DISMISSAL**

Insight Terminal Solutions is a Kentucky-turned-California company that filed for bankruptcy in 2020 in the Western District of Kentucky after its founder died and its sole asset—a lease to redevelop a shuttered California army base to ship coal—was stymied by the City of Oakland. A year later, ITS emerged from insolvency under the ownership of one of its former creditors, Autumn Wind (another California company). Then, in 2024, ITS returned to federal court in Kentucky to sue the City of Oakland for alleged tortious interference that it said caused the whole sad spiral. Curiously, ITS didn't file a freestanding complaint, but instead an "adversary proceeding" appended to the post-reorganization bankruptcy proceeding. Curiouser still, it hadn't pursued (or even mentioned) these potential claims in its bankruptcy filings, even though almost all the allegedly tortious conduct by the City occurred *before* the bankruptcy filing.

Why are these tort claims between a California-based plaintiff and a California municipality, involving alleged misconduct in California that violated California state law, being litigated in Louisville, Kentucky? Especially because the City's main merits defenses—immunity, preclusion, and untimeliness—all arise under California law as well?

The answer, thus far anyway, has been that according to ITS and the Bankruptcy Court, this dispute is at least arguably "related to" ITS's previous bankruptcy. And bankruptcy jurisdiction is indeed quite expansive: even apart from claims "arising under" the reorganization, jurisdiction may extend to any lawsuit "related to" the bankruptcy. 28 U.S.C. § 1334(b). That is, when the outcome "could conceivably have any effect on the estate being administered in bankruptcy." *In re Wolverine Radio*, 930 F.2d 1132, 1142 (6th Cir. 1991) (quoting *Pacor, Inc. v. Higgins* (*In re Pacor*), 743 F.2d 984, 994 (3d Cir. 1984). What reorganized debtor *wouldn't* consider returning to a bankruptcy court in the Bluegrass state rather than visiting state court in California? Bankruptcy's discovery rules are more generous, its docket

moves faster, and the judge is already familiar. And the de jure jurisdictional hurdle is hardly insurmountable: "as many a curbstone philosopher has observed, everything is related to everything else." *California Division of Labor Standards Enforcement v. Dillingham Construction*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring).

Leery of these temptations, courts have resisted a maximalist interpretation of "related-to" (or "non-core," in the parlance of practitioners) jurisdiction that would extend a radioactive half-life to reorganization. Which is, after all, a process that does (or at least should) prioritize a speedy reemergence from insolvency. *See* 7 COLLIER ON BANKRUPTCY ¶ 1100.09 (16th ed. 2026). And after confirmation of a plan, many courts have held that "related-to" jurisdiction narrows considerably. *See, e.g.*, *In re Greektown Holdings, LLC*, 728 F.3d 567, 577 (6th Cir. 2013). Although a bright-line rule has proved elusive, the facts here surely lie beyond the perimeter: tortious conduct that allegedly predated the petition and continued during and after the proceedings, leading to claims neither pursued nor even mentioned in the debtor's filings, without any possible effect on a creditor other than the new owner. Even assuming such a scenario might "relate to" the bankruptcy under a wooden reading of § 1334(b), moreover, this case presents an obvious opportunity for a federal judge to exercise the broad and explicit discretion to abstain from hearing the case under § 1334(c). The Court therefore dismisses the case without prejudice.

## I. FACTUAL ALLEGATIONS

According to ITS's complaint, the City of Oakland decided to build a shipping terminal at a former Army base on the San Francisco Bay to export coal (among other commodities). Complaint (Bankr. DN 1) ¶ 2. The City entered a development agreement in 2013 with an affiliate of Oakland Bulk & Oversized Terminal, which later received an assignment of these rights from the affiliate. *Id.* at 2 n.1. OBOT and the City then signed a lease in 2016. *Id.* ¶ 2. "The Ground Lease charged OBOT with developing and constructing the Terminal and [a] rail network" and gave OBOT operating rights for 66 years. ¶¶ 2–3. OBOT would then contract with a third party to operate the terminal. ¶ 3. In 2018, OBOT contracted with Insight Terminal Solutions to be that operator. ¶ 4. OBOT and ITS agreed to a "sub-ground lease" that charged ITS with "designing, constructing, and operating the Terminal" for the remainder of OBOT's "ground lease." *Id.*

As of 2024, construction still hadn't commenced. ITS asserts that this was because the City "caved to political pressure and environmental advocates" who opposed coal "being handled, stored or shipped through the Terminal," causing the City to launch a "coordinated effort to thwart construction" by imposing procedural and regulatory hurdles. ¶ 6. First, the City passed an ordinance that aimed to ban shipment and handling of coal at the terminal. ¶ 30. A federal district court in California enjoined that ordinance in 2018 as a breach of the development agreement.

*Oakland Bulk & Oversized Terminal v. City of Oakland*, 321 F. Supp. 3d 986, 1010–11 (N.D. Cal. 2018). Later, the City purported to terminate the ground lease and refused to recognize ITS's sub-ground lease. Complaint ¶¶ 7, 35. Both maneuvers were prohibited according to a California state court handling separate litigation: the City had acted unlawfully and in bad faith. ¶¶ 8–10 (discussing Statement of Decision, *Oakland Bulk & Oversized Terminal v. City of Oakland*, Nos. RG18930929, RG20062473 (Alameda County Sup. Ct. Nov. 22, 2023)). That court entered judgment for OBOT in January 2024. ¶¶ 9, 40. ITS also points to "the City's … vigorous public opposition to the handling of coal at the Terminal" and its refusal to issue necessary letters and permits as part of this coordinated campaign. ¶¶ 43, 54–55, 60–61.

These actions taken together, ITS now says, amounted to tortious interference and resulted in its inability to secure necessary financing to build the terminal. ¶ 54. And so it had no choice but to file for bankruptcy protection. *Id.*

## II. This Litigation

### A. Bankruptcy Proceedings

The tortured and extensive litigation(s) that led to this motion bear directly on whether and why jurisdiction is—or isn't—appropriate here.

ITS filed for bankruptcy in 2019 in the Western District of Kentucky, where its former owner, the late John Siegel, lived. *See* Bankruptcy Petition (Bankr. Case 19-32231, DN 1). The Bankruptcy Court confirmed a plan of reorganization that transferred ITS's ownership to one of its creditors, Autumn Wind Lending, in November 2020. (Bankr. Case 19-32231, DN 379). Autumn Wind has since owned and attempted to operate the company—whose primary (and perhaps sole) asset is the "Sub Ground Lease between OBOT and ITS to construct a terminal that the City of Oakland no longer wants.

More than three years passed between the plan's confirmation and ITS's filing, in March 2024, of this adversary proceeding against the City of Oakland.[1] The complaint seeks damages of at least $1 billion based on two related torts: tortious

[1] Adversary proceedings "are 'essentially full civil lawsuits carried out under the umbrella of the bankruptcy case,' generally governed by the Federal Rules of Civil Procedure or bankruptcy rule adaptations of them." *In re Jackson Masonry*, 906 F.3d 494, 500 (6th Cir. 2018) (quoting *Bullard v. Blue Hills Bank*, 575 U.S. 496, 505 (2015)). They "are initiated when a party files a complaint with the bankruptcy court." *In re Yousif*, 201 F.3d 774, 781 (6th Cir. 2000) (Moore, J., concurring). A bankruptcy court typically handles adversary proceedings under the district court's standing reference order. *See* 28 U.S.C. § 157(a). But "[t]he district court may withdraw" that reference "on its own motion or on timely motion of any party, for cause shown," in which case, the district court takes over. § 157(d).

interference with prospective economic advantage and tortious interference with contract. *See* Complaint (Bankr. DN 1) ¶¶ 10, 65–88. The complaint made clear that the allegedly tortious conduct had occurred in California, the parties are located in California, and the causes of action arise under California state law. Yet ITS filed the complaint as an adversary proceeding in Kentucky bankruptcy court. ¶ 11–14; *see* FED. R. BANKR. P. 7001. ITS initially asserted (without elaboration or justification) that its claims amounted to a "core proceeding"—meaning one that "arises under" the Bankruptcy Code—"within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O)." Complaint ¶ 12.

The City of Oakland, which had received notice of the bankruptcy but was not a creditor, denied that the federal bankruptcy court had jurisdiction. It moved to dismiss on that basis (as well as on grounds of immunity, untimeliness, preclusion, and insufficient pleading). City's Motion to Dismiss (Bankr. DN 25).

The Bankruptcy Court denied the City's motion in a ruling that adopted (apparently verbatim) ITS's 20-page proposed order. And that proposed order reflected a change in ITS's jurisdictional position. Rather than contending these tort claims "arose under" the bankruptcy laws, it fell back (again without explanation) to the more defensible line that the claims merely "related to" ITS's bankruptcy. *See* Order Denying Motion to Dismiss (Bankr. DN 56) at 9 (citing 28 U.S.C. § 1334(b)); ITS's Proposed MTD Order (Bankr. DN 55) at 9.

In response to the Bankruptcy Court's decision to exercise jurisdiction over the 2024 tortious-interference claims, the City filed a motion to "withdraw the reference" from the Bankruptcy Court and transfer venue to a federal district court in California. DN 1 at 1 (citing 28 U.S.C. § 157(d)). Meanwhile, the adversary proceeding moved on to discovery, which concluded in June 2025.[2]

While the City's withdrawal-and-transfer motion remained pending in this Court, the parties filed cross-motions for summary judgment in the Bankruptcy Court. *See* ITS Motion for Summary Judgment (Bankr. DN 116); City Motion for Summary Judgment (Bankr. DN 118). During a hearing on the non-summary-judgment motions, this Court agreed with ITS that the fully briefed summary-judgment motions should first be addressed by the Bankruptcy Judge who'd thus far presided over the case. Her decision, as the parties agreed, would come in the form of *proposed* findings of fact and conclusions of law, not a final judgment. *See*

[2] The City has also appealed one of the Bankruptcy Court's discovery rulings in a case separately pending before this Court (No. 3:23-cv-65). By the parties' agreement, that appeal—and any further contested discovery—remains stayed pending the resolution of this motion. *See* Order Following September 12 Hearing (DN 31). The Court will address that pending appeal in a separate order.

September 12 Hearing Transcript (DN 41) at 28–34. So the Court denied without prejudice the City's motion to withdraw the reference, declined to transfer venue, and agreed to take up these threshold arguments again if ITS prevailed on summary judgment. *See* Order Following September 12 Hearing (DN 31).

As expected, the Bankruptcy Court issued a report and recommendation covering its findings of fact and conclusions of law. Findings of Fact & Conclusions of Law (Bankr. DN 142). That October 28 order reiterated the Bankruptcy Judge's earlier conclusion that the adversary proceeding was "related to" the previous bankruptcy reorganization and therefore properly within the Bankruptcy Court's non-core jurisdiction, which left those recommendations non-final unless and until adopted by the district court. *Id.* at 19. *See also* ITS's Proposed Findings of Fact and Conclusions of Law (DN 139) at 19. The Bankruptcy Court then proceeded to accept the remainder of ITS's arguments as well, entering an order that was again nearly identical to ITS's proposed order. The order concluded that the City was liable for tortious interference with ITS's lease and business expectations and deferred the question of damages for a jury trial in federal district court. Findings of Fact and Conclusions of Law at 47–48.

### B. The Jurisdictional "Scrivener's Error"

Then the case took an unusual turn. Consistent with this Court's order following the September hearing, the parties filed a joint status report (DN 32) the day after the summary-judgment ruling. That report proposed briefing schedules to address the City's several objections—on jurisdiction, preclusion, statute of limitations, and the like—to the Bankruptcy Court's summary-judgment and motion-to-dismiss rulings. *Id.* The City, seemingly inadvertently, filed that status report in the Bankruptcy Court's docket too.

Apparently in response, the Bankruptcy Judge issued a *sua sponte* order on October 30 declaring that its October 28 order contained a "scrivener's error … that referenced Fed. R. Bank. P. 9033."[3] Correcting Order (Bankr. DN 146) at 1. The *sua sponte* order pinned the purported error on the "parties in their respective proposed findings of fact," and explained that the summary-judgment order "subsequently reiterated" the error "by inadvertence." *Id.* (emphasis omitted). Actually, the Bankruptcy Court clarified, the summary-judgment ruling was not a recommendation for this court but instead a final order: "The only matter reserved

---

[3] Rule 9033(b) gives parties 14 days after service to file and serve objections to the Bankruptcy Court's findings of fact and conclusions of law. And subsection (c) directs the district judge to review "de novo … any part of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made." In other words, Rule 9033 connotes the Bankruptcy Court's "related-to" non-core jurisdiction.

for trial is the matter of potential damages," while the "rulings on the Motions for Summary Judgment and the Judgment entered in related thereto, the Judgment entered, along with its related analysis, findings and conclusions, is final." *Id.* The October 30 order did not, however, alter or withdraw any of the summary-judgment analysis or otherwise mention jurisdiction.

Why was the scrivener's error so significant? As ITS noted during a district-court hearing the next day, a final summary-judgment order on liability necessarily "takes a different position" on jurisdiction than the Bankruptcy Court's previous orders. October 31 Hearing Transcript (DN 38) at 5. That is, the Bankruptcy Court now purported to exercise core jurisdiction by resolving matters "arising under" the Bankruptcy Code. And ITS soon endorsed that new position. *See, e.g.*, ITS Motion to Amend Order Withdrawing the Reference (DN 40); ITS Objection to City's Motion to Vacate (DN 44).

The core/non-core distinction emerges from two provisions in Title 28. Section 1334(b) provides that federal courts "shall have original but not exclusive jurisdiction of all civil proceedings *arising under* title 11"—the Bankruptcy Code—"or arising in *or related to* cases under title 11." 28 U.S.C. § 1334(b) (emphases added). Proceedings that "arise under" the Bankruptcy Code are often known as "core" proceedings, and the Code provides a non-exhaustive list of 16 examples. 28 U.S.C. § 157(b)(2). Proceedings that merely "relate to" the Bankruptcy Code, meanwhile, are known as "non-core proceedings." 28 U.S.C. § 157(c). Either core or non-core jurisdiction is sufficient for a case to remain in federal court—though the respective roles of the bankruptcy and district judges differ significantly based on which font of jurisdiction is tapped.

In core proceedings—those that arise under federal bankruptcy law—a bankruptcy court may enter final judgment. 28 U.S.C. § 157(b). And a party may appeal a final judgment issued under § 157(b) to the district court under 28 U.S.C. § 158(a). In non-core cases, however, a bankruptcy judge's role is more akin to that of a magistrate judge: she may "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge." § 157(c)(1). And as with motions before magistrate judges, parties may (within 14 days) object to a bankruptcy judge's recommendations and receive de novo review under a process outlined in Federal Bankruptcy Rule 9033. *Id.*; *compare* Fed. Bankr. R. 9033(b), *with* Fed. R. Civ. P. 72(b).

At least as of September 12, everyone understood the Bankruptcy Court to be exercising non-core jurisdiction. The City's anticipated objections to the Bankruptcy Judge's findings would come to the district court under Rule 9033—as would've been clear to anyone listening to that day's hearing. September 12 Hearing Transcript at 28–34. Even if the Bankruptcy Court had issued a final judgment under § 157(b), the

City could have appealed to the district court under § 158(a) and received de novo review of the grant of summary judgment.

However labeled, the ball had by now bounced fully into the federal district court. The only additional step contemplated by the bankruptcy ruling was a jury trial on damages, which all agreed must happen in an Article III court. So the decision to grant the City's motion to withdraw the reference (DN 1) became academic; nothing remained for the Bankruptcy Court to do. *See* Order (DN 36) at 1.

The City then moved to vacate the Bankruptcy Court's putative judgment because "bankruptcy courts have no authority to enter judgment in non-core matters." Motion to Vacate (DN 39) at 3. ITS opposed the motion. *See* ITS Response to Motion to Vacate (DN 44). But it at least conceded that the summary-judgment ruling was not final—given the lingering damages issue—meaning the Bankruptcy Court should not have entered final judgment. *Id.* at 3 (citing *Rudd Construction Equipment Co. v. Home Insurance Co.*, 711 F.2d 54, 56 (6th Cir. 1983)). Reasoning that the Bankruptcy Court's judgment was neither procedurally final nor jurisdictionally proper, this Court vacated the that *sua sponte* order and set a briefing schedule (and eventually oral argument) to address the City's remaining objections. *See* Order Vacating Judgment (DN 49).[4]

## III. THIS COURT'S JURISDICTION

The first, most important, and ultimately dispositive, question is whether this Court has jurisdiction over ITS's claims. If not, the Court must dismiss the case; the City's remaining immunity, timeliness, and merits objections need not (and indeed cannot) be resolved in this forum.

"[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Setting aside any issues with argument preservation,[5] ITS's

---

[4] The City styled its motion containing those objections as "Rule 9033 Objections to and/or Motion for Reconsideration of Bankruptcy Court Proposed Findings of Fact and Conclusions of Law …, and Renewed Motion for Summary Judgment." DN 50. Given the procedural complexity of this litigation, the base-covering shown in the motion's in-the-alternative titling is understandable. Ultimately, however, the label is immaterial. Whether the Court construes the City's motion as Rule 9033 objections to the Bankruptcy Judge's purportedly final judgment or instead as a summary-judgment motion following the reference withdrawal doesn't matter because the Court lacks jurisdiction.

[5] *Compare* Complaint (Bankr. DN 1) at 4 (asserting core jurisdiction under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O)), *with* Response to MTD (Bankr. DN 42) at 10 n.7 (contending the question of core vs. non-core jurisdiction was irrelevant), *and* ITS's Proposed MTD Order (Bankr. DN 55) at 9 (arguing only that proceeding is "related-to" bankruptcy estate).

arguments about core jurisdiction largely dovetail with the Bankruptcy Court's (initial) conclusions about related-to jurisdiction: namely that this litigation concerns the estate's main asset, the sublease, and so is necessarily "core," or at least "related to," the bankruptcy case. *See* ITS Response to City's MSJ (DN 54) at 15. This Court would review the Bankruptcy Court's grant of summary judgment de novo whether objections arrived through Rule 9033 or through an appeal under 28 U.S.C. § 158(a). *See* n.4 above; *Rosen v. Bezner*, 996 F.2d 1527, 1530 & n.2 (3d Cir. 1993) (appeal of bankruptcy court's grant of summary judgment under § 158(a) receives "plenary review" because "any purported 'factual findings' … are conclusions as a matter of law that no genuine issue of material fact exists). Either core or non-core jurisdiction is sufficient for a case to remain in federal court; because the provisions "operate conjunctively to define the scope of jurisdiction … it is necessary only to determine whether a matter is at least 'related to' the bankruptcy." *In re Wolverine*, 930 F.2d at 1141. So the Court focuses on the substantive question of relatedness rather than continuing to indulge quibbling about statutory labels.

Neither the Bankruptcy Code nor § 1334(b) defines what it means for a proceeding to "relate to" a bankruptcy for jurisdictional purposes. Congress's word choice, however, "suggests a grant of some breadth." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995). As the Supreme Court has noted, "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Id.* (quotation marks omitted). But the Supreme Court has also observed—and the Sixth Circuit has agreed—that "a bankruptcy court's 'related to' jurisdiction cannot be limitless." *Id. See also Robinson v. Michigan Consolidated Gas Co.*, 918 F.2d 579, 584 (6th Cir. 1990) ("[S]ituations may arise where an extremely tenuous connection to the estate would not satisfy the jurisdictional requirement.") (citation omitted).

The closest approximation of a rule (if such a broad standard may be so described) for determining related-to jurisdiction comes from the Third Circuit's decision in *Pacor, Inc. v. Higgins*: "whether the outcome of [the] proceeding could conceivably have any effect on the estate being administered in bankruptcy." 743 F.2d 984, 994 (3d Cir. 1984). Jurisdiction requires "some nexus between the 'related' civil proceeding and the title 11 case." *In re Greektown Holdings*, 728 F.3d 567, 577 (6th Cir. 2013) (citation omitted). Nine Circuits, including the Sixth, have adopted the *Pacor* standard, and the Supreme Court has cited it approvingly. *See Celotex*, 514 U.S. at 308 n.6 (collecting cases); 1 COLLIER ¶ 3.01[3][e][ii] (same).

The "nexus" between a "'related' civil proceeding and the title 11 case" is typically close and clear while a bankruptcy remains ongoing:

> An action is "related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively

> or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate[,]" … [but] "the mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of section [1334(b)]."

*In re Dow Corning Corp.*, 86 F.3d 482, 489 (6th Cir. 1996), as amended (quoting *Pacor*, 743 F.2d at 994); *see also id.* ("[J]udicial economy itself does not justify federal jurisdiction[.]") (citation omitted).

The connection between an estate's administration and *post*-confirmation claims, by contrast, is necessarily more attenuated—if not imperceptible. Some precedent suggests—without going so far as to hold—that post-confirmation related-to jurisdiction is a contradiction in terms: "[a]t the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred." *Greektown Holdings*, 728 F.3d at 577 (quoting *In re Resorts International*, 372, F.3d 154, 165 (3d Cir. 2004)). The Fifth Circuit has gone as far as to say that "bankruptcy jurisdiction *terminates* after confirmation other than for matters pertaining to the implementation or execution of the plan." *In re Sanchez Energy*, 159 F.4th 309, 318 (5th Cir. 2025) (emphasis added) (quotation marks omitted). As that court previously—and more colorfully—put it, a company emerging from bankruptcy must "sai[l] forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy court." *In re Craig's Stores of Texas*, 266 F.3d 388, 390–91 (5th Cir. 2001) (citation omitted).

Other precedent, however, has blinked at the brightness of such a line. The Sixth Circuit "has not read the test so literally, noting instead only that '[i]t is possible that a bankruptcy court's "related to" jurisdiction diminishes somewhat post-confirmation.'" *In re HNRC Dissolution Co.*, 761 F. App'x 553, 560 (6th Cir. 2019) (quoting *Greektown Holdings*, 728 F.3d at 577). *See also In re Thickstun Brothers Equipment*, 344 B.R. 515, 521 & n.2 (B.A.P. 6th Cir. 2006) ("[L]iteral application of the *Pacor* test would virtually eliminate the bankruptcy courts' post-confirmation jurisdiction."). Even these courts that have not drawn such a hard line between pre- and post-confirmation claims have recognized its significance. The mere possibility that a case "could conceivably increase the recovery to the creditors," for example, does not represent a sufficient nexus to trigger jurisdiction, given that "such a rationale could endlessly stretch a bankruptcy court's jurisdiction." *In re Pegasus Gold*, 394 F.3d 1189, 1194 n.1 (9th Cir. 2005).

Lacking a strict jurisdictional rule, courts asking "whether there is a nexus between the other proceeding and the *bankruptcy case*" consider a variety of factors. *HNRC Dissolution Co.*, 761 F. App'x at 560 (quoting *In re Greektown Holdings*, 728

F.3d at 578). The answer turns on whether the case would implicate "legal issues concerning the interpretation, validity, and enforcement of the bankruptcy court's orders" or "re-administration of the account in bankruptcy." *Id.* *See also, In re Resorts International*, 372 F.3d at 167 ("Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus.").

So to determine jurisdiction, federal courts scrutinize a lawsuit's potential effect on the estate. But effect as of when? Caselaw and commentary indicate that "related-to jurisdiction must be assessed at the outset of the dispute," which refers to the outset of the adversary proceeding, not the underlying bankruptcy. *Bush v. United States*, 100 F.4th 807, 813 (7th Cir. 2024). "[T]he general rule applicable to federal jurisdiction—that a court's jurisdiction depends on the state of things when the action is brought—applies in bankruptcy," too. 1 COLLIER ¶ 3.01[A] (quotation marks omitted).

Under this framework, would ITS's tortious-interference claims' "resolution ha[ve] a potential effect on other creditors"? *Bush*, 100 F.4th at 813. Apparently not. According to ITS, its tort claims did not accrue until 2024, more than three years after the Bankruptcy Court's 2020 confirmation of the reorganization plan—and the point when ITS's estate "cease[d] to exist." *See* BK DN 379; *In re Greektown Holdings*, 728 F.3d at 577. And as part of the reorganization, Autumn Wind bought ITS and left other creditors unimpaired: it bought whatever upside remained in ITS's assets (effectively a single lease), including any litigation claims, while everyone else got paid in full. So even a massive recovery by ITS here would not result in any additional payout or distribution to those other creditors, who've already been made whole; no effect on the "estate being administered in bankruptcy," in other words, is evident. *See Pacor*, 743 F.2d at 994 (emphasis omitted).

Because they frequently affect the administration of the estate, causes of action that are the "property of the estate" when it filed for bankruptcy often trigger related-to jurisdiction. 1 COLLIER ¶ 3.01.[6] But the facts in the record here indicate that ITS's

---

[6] The leading bankruptcy treatise categorizes related-to cases into two groups, neither of which fits this lawsuit: "causes of action owned by the debtor that became property of a title 11 estate," and "suits between third parties that in the absence of bankruptcy, could have been brought in a district court or a state court." 1 COLLIER ¶ 3.01 (collecting cases). The former group embraces causes of action that existed when the debtor filed for bankruptcy, as opposed to "postpetition causes of action, *i.e.*, those that come into existence during the pendency of the bankruptcy case," *id.*, which fall within core bankruptcy jurisdiction, *see id.* P. 3.02[5]. ITS's claims don't fit into the latter category: As discussed below, these claims were neither identified nor litigated "during the pendency of the bankruptcy case," even though the underlying facts arguably predated the petition.

causes of action were not then the "property of the estate" when it filed for bankruptcy. A creditor or buyer would've searched in vain among the bankruptcy filings for a multimillion-dollar municipal tort claim. Autumn Wind did not list a claim against Oakland among the estate's assets when filing its proposed plans of reorganization—at least not beyond a boilerplate reservation of unspecified "litigation claims." *See* Autumn Wind Proposed Plan of Reorganization (Bankr. Case 19-32231 DN 195) at 24. Nor had ITS's original proposed plan listed these claims at all. *See* ITS Proposed Plan of Reorganization (Bankr. Case 19-32231 DN 247).

One reason for this omission, at least according to ITS's response to a statute-of-limitations defense asserted by Oakland, is that the tort claims hadn't yet accrued. They didn't accrue, argues ITS, until 2024, when a California state court "resolved the central legal question underlying the City's conduct." ITS Response to City's MSJ at 17. If that's right, the claims certainly could not have been the estate's property at the time of petition given that the Bankruptcy Court confirmed a plan in 2020. Although the alleged conduct predated the bankruptcy petition, ITS's litigation conduct indicates the claims hadn't accrued and weren't asserted or even identified "when the title 11 case was filed." 1 COLLIER ¶ 3.01. The lack of an identifiable pre-confirmation claim certainly cuts hard against any jurisdictional nexus between the claims and the estate.

So the absence of any identifiable pre-confirmation claim *or* post-confirmation distribution dooms the jurisdictional basis for ITS to return to bankruptcy court. This litigation doesn't involve application of the Bankruptcy Code, the interpretation of the reorganization plan, or any potential effects on creditors. So no nexus exists between the adversary-proceeding claims and bankruptcy-estate administration. The only relevant nexus between this case and ITS's bankruptcy is the one linking its current owners to a potential future recovery. And that does not suffice. *See In re Greektown Holdings*, 728 F.3d at 577–78 (citing *In re Resorts International*, 372 F.3d at 166–69); *see also id.* at 168 (no related-to jurisdiction where the plaintiff cannot "demonstrate how any damages recovered from the defendant [would be] necessary to effectuate the terms of the plan") (citation omitted). Even the expansive reach of related-to bankruptcy jurisdiction doesn't stretch this far.

Applying similar principles to similar scenarios, at least two bankruptcy courts have reached the same conclusion.

First, a Delaware bankruptcy court held that it lacked post-confirmation jurisdiction to hear unjust-enrichment and related state-law claims that arose before confirmation. *See In re Insilco Technologies*, 330 B.R. 512, 515 (Bankr. D. Del. 2005). The plaintiffs alleged that the parties in control of the debtor-corporation had "wrongfully exercise[d] their control over the company" by "taking unfair and harmful actions to advance their own interests, while compromising, prejudicing, and

adversely affecting the Debtors' interests." *Id.* at 515. The court lacked jurisdiction even though the relevant claims both "arose pre-petition" and fell "within the literal definition of 'Rights of Action' and the Disclosure Statement" in the bankruptcy plan. *Id.* at 523, 525. Because "pursuit of these non-core claims does not call for the interpretation of any Plan provision," the court "decline[d] to find the requisite 'close nexus' … to the bankruptcy case." *Id.* at 525–26. Moreover, the court noted that "[i]f the litigation [was] truly so critical to the Plan's implementation," the bankruptcy court reasoned, "it would have been more specifically described in the Disclosure Statement and Plan so that creditors could have considered its effect when deciding to vote in favor of the plan." *Id.* at 525.

A second case, from Tennessee, featured facts even closer to those here. *See In re Equipment Finders of Tennessee*, 473 B.R. 720 (Bankr. M.D. Tenn. 2012). Six months after confirmation, a reorganized debtor sued two noncreditors on contract and other state-law claims based on conduct that occurred before plan confirmation. But the claims were "nowhere referenced in either the Amended Plan or Disclosure Statement." *Id.* at 734. The claims did not require anyone to "interpret, construe, enforce or implement" a bankruptcy plan, nor did they "affect the rights of any creditor under the confirmed plan." *Id.* So "[u]nder any construct of post confirmation jurisdiction embraced by the courts," the proceeding lay "beyond bankruptcy court subject matter jurisdiction." *Id.*

Although appellate courts have applied the framework laid out above to varied effect in varied circumstances, some decisions notably align with the circumstances and disposition of this case. In *Valley Historic Limited Partnership v. Bank of New York*, for example, the Fourth Circuit held that related-to jurisdiction did not exist when the debtor brought breach and tortious-interference claims against a creditor after confirmation of the reorganization plan. *See* 486 F.3d 831, 836–37 (4th Cir. 2007). And in *In re Resorts International*, the Third Circuit likewise recognized that extending related-to jurisdiction to a trustee's post-confirmation malpractice and breach claims against the accountants for the litigation trust "would widen the scope of bankruptcy court jurisdiction beyond what [C]ongress intended." 372 F.3d at 157, 170–71.

Evidently no contrary caselaw supports ITS's position. It hasn't pointed to any decision—and this Court has found none—holding that jurisdiction existed in similar circumstances. That is, no decision in which a bankruptcy court exercised related-to jurisdiction over claims that were never mentioned during the bankruptcy proceedings, required no interpretation of the bankruptcy plan, and wouldn't lead to recovery for any creditors. *Accord In re HNRC Dissolution Co.*, 761 F. App'x at 560 (related-to jurisdiction existed because resolution of the post-confirmation adversary proceeding would involve "legal issues … concerning the … bankruptcy court's orders" and possible "re-administration of the Account in bankruptcy"). So the federal

courts lack non-core (to say nothing of core) jurisdiction over ITS's tortious-interference claims. Any recovery would accrue to ITS's successor, not its creditors, just like any other asset—be it a litigation claim or a new lease or a cash windfall—that arrives after reorganization and confirmation.[7]

## IV. Abstention

The lack of jurisdiction alone is, of course, enough basis to vacate the Bankruptcy Court's order. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) ("[T]he first and fundamental question is that of jurisdiction."). But it's not the only reason. This case cried out for the exercise of discretionary abstention by the federal courts in favor of California litigation.

Bankruptcy abstention, unlike other species of abstention, is an express enactment of Congress. The provision of the Code that creates federal bankruptcy jurisdiction, 28 U.S.C. § 1334, contains a subsection (c)(1) providing that "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." Congress, therefore, has created an explicit exception to federal courts' "virtually unflagging" obligation to exercise their jurisdiction. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976).

Curiously, neither party asked the Court to consider abstention here.[8] But that is not dispositive. Judges may raise abstention *sua sponte*. *See, e.g.*, *In re Ottoman*, 665 B.R. 64, 66 (Bankr. E.D. Mich. 2024); *In re Repurchase Corp.*, 329 B.R. 832, 835 (Bankr. N.D. Ill. 2005); *see also* 1 COLLIER ¶ 3.05. And although bankruptcy rather than district judges ordinarily deploy this discretion, the statute expressly grants the authority to "district court[s]." 28 U.S.C. § 1334(c)(1). Indeed, some federal districts' local rules have gone as far as to *limit* its application to district rather than bankruptcy courts. *See, e.g.*, *In re Aaronics Equipment Rentals and Sales*, 56 B.R. 297, 300 (Bankr. M.D. La. 1985); *see also Bluewater Industries v. Standard Offshore Services*, No. 03-cv-2374, 2003 WL 22715670, at *2–3 (E.D. La. Nov. 12,

[7] Because the Court lacks jurisdiction over this proceeding, the Court also denies as moot the two additional motions pending in this case: ITS's request to supplement the declaration of Andrew D. Strosberg (DN 55) and the City of Oakland's request to reconsider the Court's order granting ITS leave to file post-hearing evidence (DN 86).

[8] In some circumstances, abstention is required. *See* 28 U.S.C. § 1334(c)(2); *Robinson v. Michigan Consolidated Gas Co.*, 918 F.2d 579, 584 (6th Cir. 1990) ("Mandatory abstention under section 1334(c)(2) is not jurisdictional and must be raised in a timely motion.).

2003) (district court abstaining under § 1334(c)(2) or, in the alternative, under § 1334(c)(1)).

That statutory delegation—coupled with bankruptcy courts' uneasy place within Article III when adjudicating private rights, *see generally Stern v. Marshall*, 564 U.S. 462, 486–88 (2011)—render bankruptcy abstention less constitutionally subject than its doctrinal cousins whose positive law origins remain hazy (at best). *See* Christopher Hampson, *Bankruptcy Abstention*, 106 B.U. L. REV. (forthcoming 2026, manuscript online at https://dx.doi.org/10.2139/ssrn.6198338) (federal bankruptcy law inverts the "twin principles" that ordinarily govern federal court jurisdiction—its "limited" nature and courts' "'virtually unflagging' obligation to exercise it") (citation omitted). *See also id.* at 5 n.8 (contrasting statutory bankruptcy abstention with its common-law cousins associated with the *Colorado River*, *Burford*, *Younger*, and *Pullman* decisions).

Given the absence of any compelling federal interest or bankruptcy question in this California tort dispute, deference to state-court adjudication of state-law issues makes sense for multiple reasons. ITS's claims raise (at least) three difficult and unsettled state-law questions, all of which implicate the federal judiciary's "interest of comity with State courts." 28 U.S.C. § 1334(c)(1).

First, immunity. The City argues that, as a California public entity, it is immune from common-law tort liability under the California Government Claims Act. *See* Motion at 32 (citing CAL. GOV'T CODE § 815(a)) ("A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."). That contention finds at least some purchase in the California caselaw: "Of course there is no common law tort liability for public entities in California; such liability is wholly statutory." *See In re Groundwater Cases*, 154 Cal. App. 4th 659, 688 (2007); Motion at 32. And public entities cannot be vicariously liable for acts "that are actually acts of the entity itself, albeit performed by employees or agents." *Yee v. Superior Court*, 31 Cal. App. 5th 26, 40 (2019); Motion at 33–34. Yet California law also contains (or at least once contained) various exceptions: public employees acting within the scope of their employment, *see* CAL. GOV'T CODE § 815.2(a), and, possibly, a distinction between "policy decisions" and "operational acts" on which the Bankruptcy Court rested its decision. Bankruptcy Court Order (Bankr. DN 142) at 35–36. *See also Puskar v. City and County of San Francisco*, 239 Cal. App. 4th 1248, 1253–54 (2015) (describing "former distinction between 'proprietary' and 'governmental' activities of a public entity"). As the City put it in its initial motion: "The requisite statutory basis required by the California Government Claims Act for such a waiver of sovereign immunity … is, at best, murky." Motion to Withdraw the Reference (DN 1) at 22.

Second, preclusion. The City argues that claim preclusion bars ITS's tort suit here because California courts already adjudicated this matter in *OBOT v. City of Oakland*, 54 Cal. App. 5th 738 (2020). California, according to the City, *see* City's Motion for Summary Judgment (DN 50) at 36–37, applies a broad theory of claim preclusion that "not only bars issues actually litigated but also [ones] that *could have been* litigated" in a prior suit brought to protect same "primary rights," *Atwell v. City of Rohnert Park*, 27 Cal. App. 5th 692, 698–99 (2018). Although the City concedes that the *OBOT* litigation did not involve precisely the same tort claims as ITS has raised here, it nonetheless contends that OBOT and ITS were in privity and that the claims here involve the same "primary rights" as the California court litigated there. *See* Motion at 36. ITS obviously takes a narrower view. And resolving its tort claims would necessarily entail tracing the scope of California caselaw as applied to the prior California litigation.

And third, timeliness. This issue presents quite a dilemma for ITS. If the claims hadn't accrued by 2020, then how could they have been litigated in the OBOT litigation? On the other hand, wouldn't they need to have accrued by 2020 to "relate to" the bankruptcy process? And what about the two-year statute of limitations: was it somehow tolled to allow pre-2020 claims to be asserted in 2024? *See* CAL. GOV'T CODE § 945.6. Although most of the *conduct* that forms the basis for this tort occurred in 2018 and 2019, ITS insists that the tort did not accrue until the California court issued a statement of decision in November 2023. *See* Statement of Decision (Bankr. DN 1-2) at 2; Response at 25. ITS says that's because California law contains a discovery rule: a tort claim does not accrue until the plaintiff has both suffered actual harm and has reason to suspect a factual basis for a claim. *See Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397–98 (1999). But whether and how that discovery rule would apply to a California judicial decision poses yet another difficult question of California law that should presumptively be answered first in California courts.

Should federal courts presiding over disputes in the outer reaches of "related-to" bankruptcy jurisdiction abstain from or adjudicate tricky state-law issues such as these? And does it matter that a California municipality is the defendant? Once again, no bright-line rule answers these questions. Generally, "abstention is warranted '(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" 1 COLLIER ¶ 3.05 (quoting *In re Entrust Energy*, 101 F.4th 369, 388 (5th Cir. 2024).

Consistent with those principles, courts in this circuit have identified no fewer than 13(!) principles that are relevant to a court's decision whether to abstain:

> (1) the effect or lack of effect on the efficient administration of the estate if a court abstains, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted core proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden on this court's docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, (12) the presence in the proceeding of nondebtor parties and (13) any unusual or other significant factors.

*In re Keirns*, 628 B.R. 911, 921 (Bankr. S.D. Ohio 2021) (citing cases developing and applying these factors). As should go without saying, not *all* of these reasons need be present for permissive abstention to be appropriate. *In re Johnston*, 484 B.R. 698, 714–15 (Bankr. S.D. Ohio 2012).

Here, the vast majority of those 13 considerations suggest that non-core bankruptcy jurisdiction should give way to state-court adjudication in situations, like this one, involving a host of sensitive, complicated state-law questions. At least 10 and arguably more of the factors (identified according to their placement in the *Keirns* list) point in that direction:

(1) The Bankruptcy Court has already confirmed a plan, and no other adversary proceeding or any further litigation related to the estate is in progress. So no adverse "effect on the efficient administration of the estate" is apparent.

(2) No bankruptcy-law issues persist at all; this adversary proceeding presents two state-law tort claims.

(3) The answers to critical state-law questions presented—regarding state sovereign immunity, the preclusive effect of state-court judgments, and a limitations defense—are both difficult and unsettled.

(5) No non-bankruptcy basis for jurisdiction exists.[9]

[9] During the summary-judgment hearing, the Court asked whether diversity jurisdiction might provide an alternative basis for this case to remain in federal court. Although ITS initially seemed amenable to that notion, post-hearing filings indicated that, by the time ITS filed this claim, it was undisputedly a citizen of California. As is, obviously, the City of

(6) Neither state-law claim bears on how any assets of the estate should be allocated (as evidenced by their absence from the plans proposed, including by Autumn Wind, which stands to benefit should ITS prevail here).

(7) The core proceeding all but ended after confirmation of the plan in 2021.

(8) Severing the state-law claims here is awfully easy—because they are the only claims, period. And given that Autumn Wind now owns ITS outright and the confirmed plan left other creditors unimpaired, ITS's recovery would not create complicated issues of bankruptcy administration: as ITS candidly admits, it exists in reorganized form as a vehicle "to potentially realize the value of the Sub-Ground Lease." Bankr. DN 55 at 12.

(9) Continued litigation about California state law between two California-based companies unnecessarily burdens this Court's docket.

(10) ITS's decision to file an adversary proceeding in bankruptcy court in Kentucky, rather than to sue in the California courts, carries at least a whiff of forum shopping.

(11) The City has made clear—time and again—that it intends, to the extent this case gets that far, to demand a jury trial. And a California jury seems far more appropriate than a Kentucky one to adjudicate a business dispute between two California companies. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947) ("Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation.").

(13) As for "unusual or significant factor[s] beyond those already discussed," arguably many apply, and perhaps in either direction. But the local interests at stake, including potentially even the insolvency of the City of Oakland, tilt this factor, too, in favor of abstention.

The remaining factors, it's fair to say, would not support abstention. But they cut only weakly, if at all, in favor of federal bankruptcy jurisdiction. As to the twelfth—the presence of nondebtor parties—one debtor (or at least former debtor) is involved, alongside one nondebtor. This says very little indeed here. And as to the fourth factor, no competing proceeding is currently pending in state or non-bankruptcy court. To be sure, this may work serious harm to ITS if limitations issues, for example, preclude further litigation in an alternative forum. Though that

---

Oakland. Because a party's citizenship is determined at the time of filing—rather than at the time events arose—diversity jurisdiction doesn't exist. *See Freeport-McMoRan v. K N Energy*, 498 U.S. 426, 428 (1991).

outcome was one that ITS could've and surely did contemplate when deciding to litigate here.

All told, at least ten of the relevant principles favor abstention, while none obviously point the other way. Abstention would not be without costs, of course. In addition to the timeliness concern noted above, the parties (to say nothing of the Bankruptcy Court) have invested significant time and effort in this litigation. Particularly given the degree to which the state-law issues bear on sensitive questions of sovereignty and finality, however, principles of federalism and comity counsel deference to California courts. *See Elkins v. Moreno*, 435 U.S. 647, 662 n.16 (1978) (deferring to state court on question "in which state governments have the highest interest"). Although no party requested abstention here, these concerns would lead this Court to have abstained even if the underlying related-to jurisdictional question had come out the other way. And because abstention decisions are "not reviewable by appeal or otherwise by the court of appeals … or by the Supreme Court of the United States," a state court would be the parties' next destination regardless. *See* 28 U.S.C. § 1334(d).[10]

## ORDER

Given the absence of "related-to" bankruptcy jurisdiction, the Court vacates the Bankruptcy Court's summary-judgment order (Bankr. DN 142), grants the City's summary-judgment motion insofar as it challenged subject-matter jurisdiction, and dismisses the adversary proceeding without prejudice. Given that dismissal, the Court denies as moot ITS's request to supplement (DN 55) and the City's request for reconsideration (DN 86). A separate final judgment will follow. *See* FED. R. CIV. P. 58.

Benjamin Beaton, District Judge
United States District Court

September 30, 2026

[10] Absent the jurisdictional issue, the Court would presumably have discretion either to dismiss the case or hold it in abeyance while the state court litigated the tort claims. *See* 11 U.S.C. § 305(a) (providing those options in similar abstention provision). But the Court need not specify an alternative disposition here given that the lack of related-to jurisdiction makes dismissal the appropriate course.